# Exhibit 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.: 18-cv-04051; 18-
   cv-09840; 18-cv-09841; 18-cv-10098; 19-cv-
   01812; 19-cv-01866; 19-cv-01898.

MASTER DOCKET

18-md-2865 (LAK)

**Declaration on certain aspects of Danish law**
**By**
**Mads Bryde Andersen,**
Professor of Law
Center for Market and Economic Law
University of Copenhagen

Copenhagen, Denmark
June 6, 2022

# Contents

I.    QUALIFICATIONS ................................................................................................. 4

II.    OVERALL MANDATE AND DOCUMENTATION REVIEWED ................................. 5

   A.    The questions raised .................................................................................. 5

   B.    Documentation viewed .............................................................................. 6

   C.    Legal method ............................................................................................ 6

III.    THE BENEFICIAL OWNERSHIP CONCEPT ........................................................ 8

   A.    The term "beneficial owner" ..................................................................... 8

   B.    Starting point ............................................................................................ 8

   C.    Practice from the Danish Tax Tribunal .................................................... 10

   D.    Recent Danish Court Practice ................................................................. 13

   E.    The 28 April 2022 Eastern High Court decision in the Bech-Bruun case ................... 13

   F.   Conclusion .............................................................................................. 15

IV.   SKAT's Fraud claims ...................................................................................... 15

   A.    SKAT's claims ........................................................................................ 15

   B.    The culpa rule ......................................................................................... 16

   C.    Willful acts .............................................................................................. 17

V.   SKAT's Negligent misrepresentation claims ................................................... 17

   A.    Does SKAT need to prove contractual privity towards the defendants? ...................... 17

   B.    The standard of negligence in Danish tort law ........................................ 18

VI.   SKAT's aiding and abetting fraud claims ........................................................ 19

   A.    The general rule in Danish law on liability for aiding and abetting ........................... 19

   B.    Liability for the aiding and abetting of legal advisors etc. ........................ 20

   C.    The Thrane case ..................................................................................... 21

   D.    Conclusion .............................................................................................. 24

VII.   Additional Issues Concerning Misrepresentation ............................................ 24

   A.    Misrepresentations about ownership or entitlement................................. 24

   B.    The standard of proof ............................................................................. 25

VIII.   SKAT's status as a legal entity in Danish law ................................................ 25

   A.    Summary of conclusions ......................................................................... 25

   B.    Rebuttal of certain points in *Pilgaard II* ................................................. 26

      1.    The Kingdom of Denmark vs. the Church of Denmark ............................. 26

      2.    The prerogative pursuant to Section 14 of the Danish constitution is indeed absolute 27

    3.     Danish ministries as plaintiffs in litigation ................................................. 29

    4.     Locus standi ............................................................................................. 30

    5.     The legal personality of Denmark ............................................................ 31

 C.    The ability of Danish Courts to entertain the reverse situation ...................... 32

 D.    Conclusion ........................................................................................................ 33

IX.   Statutory limitations of monetary claims in Danish law .................................... 33

 A.    The questions before me .................................................................................. 33

 B.    The start of the limitation period .................................................................... 34

    1.     The general rule of DLA Section 2(1) ...................................................... 34

    2.     SKAT's Tort claims .................................................................................. 34

    3.     SKAT's Restitutional Claims ................................................................... 35

    4.     SKAT's Unjust Enrichment Claims ......................................................... 35

    5.     Conclusion ............................................................................................... 36

 C.    Did SKAT have sufficient knowledge of its claims prior to Summer 2015? ................ 36

    1.     DLA Section 3(2) ..................................................................................... 36

    2.     SKAT's obligation to investigate ............................................................ 36

    3.     Cases regarding withheld information ...................................................... 38

    4.     Cases with full disclosure ........................................................................ 42

    5.     Discussion ................................................................................................ 43

 D.    Specific questions ............................................................................................ 46

    1.     For each claim, does the limitations period apply separately to each individual payment that SKAT made? .................................................................................... 46

    2.     Should SKAT have known about all its claims before January 1, 2015, even if it did not discover that there was a fraud, and the identity of the defendants who were committing the fraud until long after January 1, 2015? .......................................... 46

I, Mads Bryde Andersen, professor of law, declare the following:

## I.    QUALIFICATIONS

1.    Since 1991 I have served as a professor of private law at the University of Copenhagen, Denmark, from which university I graduated with a *candidatus juris* degree (LL.M.) in 1981. During the years 1981-1986 I worked as a lawyer for a mid-size Copenhagen law firm. I was admitted to the High Courts of Denmark in 1984. I joined the University of Copenhagen Law Faculty in 1987 at which faculty I took the doctor juris degree in 1989 with a dissertation on contract and tort liability for computer malfunctions.

2.    Alongside my academic career I have held a number of positions of trust within various Danish government branches. I served as *chairman* of the board of the Danish Financial Supervisory Authority (Finanstilsynet) from 2014-2016, of the Danish Radio and Television Council (Radio- og tv-nævnet) from 2011-2016) and of the Danish Government IT Security Council (IT-sikkerhedsrådet) from 1995-2002). I have also served as a *board member* of the Danish Government Commercial Complaints Board (Erhvervsankenævnet) from 1995-2014. Since 2018 I have served as a board member of Statistics Denmark (Danmarks Statistik).

3.    For further information on my background, I refer to the enclosed CV (attached as Exhibit 1).

4.    I have written this legal Declaration at the request of Plaintiff, Customs and Tax Administration of The Kingdom of Denmark (Skatteforvaltningen), in the following referred to as "SKAT".

5.    SKAT is compensating me for my work in preparing this Declaration on a per-hour basis.

6.      I have also assisted SKAT as an expert in related litigations initiated by SKAT in other jurisdictions.

7.      In the present litigation, I have previously rendered the following statements:

- Declaration Regarding Danish Law (on the question of SKAT's legal standing), dated 12 July 2019 (attached as <u>Exhibit 2</u>, in the following referred to as, "*Andersen I*")
- Declaration Regarding the Danish Statute of Limitations, dated 23 November 2020 (attached as <u>Exhibit 3</u>, in the following referred to as, "*Andersen II*").

## II.      OVERALL MANDATE AND DOCUMENTATION REVIEWED

### A.      <u>The questions raised</u>

8.      Counsel for SKAT has invited me to describe certain parts of Danish law that pertain to the following main areas:

9.      *First*, I have been invited to comment on the "beneficial owner" concept as applied in the 1999 Convention between the United States of America and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income with Protocol as amended by a protocol of 2 May 2006 (hereinafter, *the "US/Denmark Convention"*). Both this convention and its protocol are based on the OECD model conventions. My discussion on this issue and of the nature of SKAT's claims in overview is presented below at III).

10.      *Secondly*, I have been invited to comment on some of the claims that SKAT has introduced in this litigation, including:

- SKAT's Fraud claims (discussed below in Section IV);
- SKAT's Negligent misrepresentation claims (discussed below in Section V);
- SKAT's Aiding and Abetting Fraud claims (discussed below in Section VI);
- Certain additional issues concerning misrepresentation (discussed below in Section VII).

11.     *Third*, I have been invited to comment on SKAT's status as a legal entity in Danish law (discussed below in Section VIII).

12.     And *finally* I have been invited to answer certain question regarding the statutory limitations of monetary claims in Danish law (discussed below in Section IX).

## B.     Documentation viewed

13.     True and correct copies of the Danish authorities that I have cited herein are attached as Exhibits to this Declaration, with accompanying English translations.  For the purpose of rendering this statement, I have studied the following documents:

- Plaintiff Skatteforvaltningen's Memorandum of Law in Support of its Motion for Partial Summary Judgment, dated 29 April 2022 (attached as Exhibit 4, in the following referred to as, "*Plaintiff's Memorandum*");
- Defendants' and Third-Party Defendants' Memorandum in Support of Motion for Summary Judgment, dated 29 April 2022 (attached as Exhibit 5, in the following referred to as, "*Defendants' Memorandum*");
- Declaration of Foreign Law of Kasper Bech Pilgaard, dated 11 June 2019 (attached as Exhibit 6, in the following referred to as, "*Pilgaard I*");
- Declaration of Foreign Law of Kasper Bech Pilgaard, dated 27 April 2022 (attached as Exhibit 7, in the following referred to as, "*Pilgaard II*");
- Declaration of Foreign Law of Anders Ørgaard, dated 22 November 2021 (attached as Exhibit 8, in the following referred to as, "*Ørgaard I*").

## C.     Legal method

14.     I render this Declaration being an expert in the Danish Legal system in general and in particular on the Danish private law.

15.     As a basis for my analysis, I have studied relevant decisions from Danish Courts. The main part of this case law is reported in the Danish Weekly Law Report ("Ugeskrift for Retsvæsen", in the following referred to as "**U**", followed with a number indicating the relevant year, page number and a symbol indicating the court in question – e.g., *U 1963.377 H* where "**H**"

stands for "Højesteret", i.e. the Danish Supreme Court).[1] Certain cases have been reported in the periodical "Tidsskrift for Skatteret" (*Journal of Tax Law*), in the following referred to as **TfS** to which I will refer by the same principles of abbreviation.

16.    I have also referred to cases from other Danish courts, including *Østre Landsret* (the Eastern High Court, referred to as "**Ø**"), and *Vestre Landsret* (the Western High Court, referred to as "**V**").

17.    Furthermore, I have made reference to cases decided by *Landsskatteretten* (in the following referred to as the Danish Tax Tribunal). The Tax Tribunal is an administrative complaints board which is not part of the Danish judiciary system. Since, however, it is considered to be independent of the Danish government (including SKAT and the Ministry of Taxation) its decisions are generally regarded as indicative of Danish tax law.

18.    A taxpayer who has not prevailed in a case before the Tax Tribunal may bring its case to a state court within three months after the decision has been made. This rule follows from Section 48, sub-paragraph 3, of the Danish Tax Administration Act (Skattekontrolloven) (attached as <u>Exhibit 9</u>). If such litigation is not initiated, the Tax Tribunal's decision becomes final. In the following I will only make references to such decisions from the Tax Tribunal which have not been brought before a state court.

19.    In relation to my statements below in Section IX I should add that the Danish Limitation Act is subject to an extensive (1157 pages) and highly reputed handbook by Professor *Bo von Eyben*, the 2nd edition of which came out in 2019 under the title: "Forældelse efter

---

[1] Danish courts appear at three levels: The lower level consists of 24 *City Courts*. The middle level consists of two *High Courts* (one for the Eastern Circuit and one for the Western). On the top of the judicial hierarchy there is one single *Supreme Court*. In general, cases are heard in the first instance by a City Court from which they can be appealed to a High Court and – under certain circumstances, and subject to permission from the Appeals Permissions Board – further on to the Supreme Court. The reasoning of the Supreme Court is, in principle, binding for lower courts, and even for the Supreme Court itself in subsequent cases.

forældelsesloven af 2007" (*Prescription under the 2007 DLA*). In the following I shall refer to this book as "***von Eyben***".

### III.    THE BENEFICIAL OWNERSHIP CONCEPT

#### A.    <u>The term "beneficial owner"</u>

20.    Under Article 10(3) of the US/Denmark Convention, a refund of tax withheld on Danish dividends is available to a qualifying "pension fund" (as defined in Article 22(2)(e) of the Convention) that is a "beneficial owner" of the dividend.

21.    For the (typical) investors who buy shares to own them, to enjoy dividend payments from them, and at some point in time, to sell them again at a higher price, the beneficial ownership concept does not give rise to any doubt. But in more complicated transactions regarding the distribution of ownership of real shares, the concept may give rise to uncertainties.

22.    In the following, I will discuss this issue in the light of the general understanding of "ownership" in Danish law, and by making reference to illustrative case law from the Danish Tax Tribunal and the Eastern High Court.

#### B.    <u>Starting point</u>

23.    It is obvious that the word "ownership" is generally used for situations where a party can dispose of any right to the property in question unless otherwise provided.

24.    To substantiate this conclusion, I refer to the definition by Professor Henrik Zahle in the Danish Encyclopedia ("Den Store Danske"), available at <u>www.lex.dk</u> as follows:[2]

---

[2] The Danish wording of the quote reads as follows: "Ejendomsret, fuldstændig ejendomsret, ret til i enhver henseende at råde over eget formuegode, i det omfang der ikke er gjort særlige begrænsninger ved privat viljeserklæring eller ved lovgivning. Begrænsninger ved viljeserklæring kan følge af fx en pantsætnings- eller lejeaftale, og begrænsninger ifølge lovgivningen kan følge af bestemmelser i bl.a. miljø- eller byplanlovgivningen. Ejendomsretten betegnes også umiddelbar ejendomsret, fordi retten ikke er afledt af en anden videregående ret."

*"Ownership, full ownership, [is] the right to dispose of one's own property in all respects, to the extent that no special restrictions have been made by private declarations of will or by legislation. Restrictions due to declarations of will may follow from, for example, a pledge or leasing agreement, and restrictions according to the legislation may follow from provisions in e.g. environmental or urban planning legislation. Property right is also referred to as immediate property right because the right is not derived from another higher right."*

25.    SKAT in its "Legal Guidance" (Section C.F.8.2.2.10.1.3)[3] gives the following illustrative examples of "Intermediaries" (mellemmænd) who receive dividends, but who are not the beneficial owners and thus are not "recipients" within the meaning of the OECD Model Conventions:

> *"...*
> - *An agent*
> - *A nominee, ie. a named representative of the beneficial owner*
> - *A conduit company*
> - *A fiduciary, i.e. person who formally owns an asset (here a share or other ownership interest), but where the return actually accrues to a beneficiary (eligible).*
> *…"[4]*

---

[3] Available at https://skat.dk/skat.aspx?oid=2060727.
[4] The Danish text reads: "En agent, en nominee, dvs. en navngivet repræsentant for den retmæssige ejer, et conduit company, en fiduciary, dvs. person, som formelt ejer et aktiv (her en aktie eller anden ejerandel), men hvor afkastet reelt tilkommer en beneficiary (berettiget)."

## C.     Practice from the Danish Tax Tribunal

26.     The Legal Guidance, as quoted above, makes reference to a number of cases where the concept has been challenged. These cases are mentioned in *Pilgaard II*, Section (V)(C), paras. 171-178.

27.     Without going into the details of those cases it is important to note that they all related to shares that *existed*. At least, nothing else is indicated, and this presumption must be assumed as being quite evident. None of the cases thus dealt with "ownership" of shares that were bought from a purported seller that did not actually possess any actual shares and who never delivered any such shares.

28.     In this connection, it surprises me that *Pilgaard II* does not make reference to the 16 July 2020 decision from the Danish Tax Tribunal, that I refer to below in Section III(C) in the FWC Capital LLC Pension Plan case, since that case concerned exactly the same type of "beneficial ownership" interpretation as discussed here. Mr Pilgaard can hardly have been unaware of this case. It was litigated by his law firm "TVC Advokatfirma".

29.     On the other hand, I am not aware of any decision by any Danish authority that supports the claim at pages 7, 23, and 55 of Defendants' Memorandum that ownership of shares may be established under Danish law merely by entering into a contract to purchase shares, even if the shares are fictitious, that is, where the seller has no shares to sell and never delivers any actual shares.

30.     Quite contrary, recent practice from the Tax Tribunal has recognized that SKAT was defrauded into paying reclaims by applicants who submitted applications falsely claiming to own shares over which they had no ownership of any kind.

31.     As illustration of this is the decision rendered on *16 July 2020* by the Danish Tax Tribunal in relation to the FWC Capital LLC Pension Plan (attached as Exhibit 13).

10

32.     The FWC Capital LLC Pension Plan had requested that SKAT reverse its *6 April 2018* decision whereby SKAT *revoked* all its previous WHT refund decision towards the FWC Capital LLC Pension Plan.  The Tax Tribunal denied that request.  The legal reasoning of SKAT's 6 April 2018 decision is quoted on pages 11/229 to 12/229 of the Tax Tribunal's decision.

33.     The reasoning of the Tax Tribunal's decision was that the pension plan had failed to *prove* that it had owned shares and received dividends from those shares from which WHT had been withheld and that it had not established that proof, by reference to the said set of transactions. In the absence of such proof, there was no legal basis for the refund amounts already paid. I have been informed that this revocation was made towards the relevant pension plan in each of the seven bellwether cases.

34.     SKAT's 6 April 2018 decision to revoke the legal basis for these refund payments would encourage any applicant who insisted that its (refused) application for WHT refund was well-founded to file a complaint with the Tax Tribunal to have this revocation overturned. According to article 35 a, sub-paragraph 3, of the Danish Tax Administration Act, (attached as Exhibit 9) such complaints shall be made within *three months* after receipt of the decision.

35.     I have also been informed that in each of the seven bellwether cases that form parts of the present litigation, the pension plan filed similar proceedings before the Tax Tribunal. In three cases, the plans *withdrew* their appeals. In the remaining four cases, the Tax Tribunal decided the appeal *in favor of SKAT*, rejecting the arguments of the applicants that they were entitled to the reclaims that they had been paid on a theory that they were the owners of Danish shares.

36.     It transpires from pages 6-10 of the Tax Tribunal's 16 July 2020 decision that FWC Capital LLC Pension Plan had alleged that it was entitled to a WHT refund on grounds that it has participated in a so-called *share arbitrage transaction* of the kind also known in the present litigation.

37.     As indicated above in paras 32 to 33, this allegation was dismissed by the Tax Tribunal. In effect, this dismissal means that SKAT's 6 April 2018 revocation was and is upheld.

38.     I understand that FWC Capital LLC Pension Plan chose *not* to challenge the 16 July 2020 decision from the Tax Tribunal by bringing action against SKAT before the Eastern High Court. One other pension plans (AIG) did bring such action, but that plan subsequently withdrew its action. This means that the 16 July 2020 decision stands as a final and binding decision between the said parties on the merits of that case.

39.     In my opinion, those applicants (including the defendants) who chose *not* to challenge SKAT's revocations by making similar complaints have thereby accepted that their claim for WHT refunds were unfounded. Such acquiescence towards the relevant revocation decisions must in my opinion clearly qualify as an acceptance that the *refund claims* could not stand under the scrutiny offered by the Tax Tribunal and – if the parties disagreed on the Tribunal's conclusion – ultimately by a Danish court. This can only mean that the defendants have decided *not* to pursue their allegation that they did in fact have "beneficial ownership" to the said shares by challenging SKAT's revocation decision.

40.     Similarly, those applicants (including the bellwether plans RJM Capital Pension Plan, Basalt Ventures LLC Roth 401(K) Plan, and Roadcraft Technologies LLC Roth 401(K) Plan) that challenged the revocation decision but withdrew their appeals before the Tax Tribunal could render judgment, likewise must be considered to have accepted that the *refund claims*

12

could not stand under the scrutiny offered by the Tax Tribunal and – if the parties disagreed on the Tribunal's conclusion – ultimately by a Danish court.

**D.    Recent Danish Court Practice**

41.    In Section V(C) *Pilgaard II* makes reference to Danish case law which in his opinion casts light on the beneficial ownership concept.

42.    I note that *none* of the said cases relate to situations where the WHT applicant claimed ownership based only on a contract to purchase shares from a seller that had no shares and that never delivered shares. Therefore, those cases have no application to transactions where the seller never delivered actual shares to the buyer.

43.    The same goes for the reference in *Pilgaard II* Section V(D) to Danish practice on the ownership of dividends in cases where the underlying shares have been subject to certain kinds of transactions, including stock lending agreements. Also these cases relate to transactions pertaining to *existing* shares that the seller delivered to the buyer or borrower.

**E.    The 28 April 2022 Eastern High Court decision in the Bech-Bruun case**

44.    In a judgment dated 28 April 2022, the Danish Eastern High Court rejected SKAT's claims against the Danish Bech-Bruun I/S law firm for negligence in failing to detect a scheme to defraud SKAT involving the custodian North Channel Bank (attached as <u>Exhibit 34</u>). The case has been appealed to the Supreme Court by SKAT, but not by Bech-Bruun I/S law firm. Without such appeal the quoted text would stand.

45.    In relevant part, the Court found that a lawyer (in the below quotation named "A") who had provided the bank with an opinion was not liable for failing to realize that the transactions were paper transactions without actual shares. In dealing with this question, which is

now subject to appeal to the Danish Supreme Court, the Eastern High Court made the following observation:

> "The question is then whether A should have realised what turned out to be the case that the stakeholders in the tax set-up would aet in such a way that the tax set-up would be circular and that it was either proforma or solely consisted of paper transactions without any shares and actual cashflows.
>
> The High Court notes that implementing the tax set-up as proforma or <u>without any shares and actual cashflows must be deemed to be ordinary fraud under criminal law that is merely disguised by complicated transactions</u>." (Emphasis added)[5]

46.     The Court held that, in the circumstances, the lawyer who provided the opinion was entitled to assume that the parties would act in accordance with stated assumptions "about shares and dividend" and "that the stakeholders in the tax set-up would act in accordance with the model so that the set-up would not be circular and so that there were actual shares and cashflows."

---

[5] The Danish text reads:

"Spørgsmålet er herefter, om A burde have indset det, som viste sig at blive tilfældet – at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme.

Landsretten bemærker, at gennemførelse af skattearrangementet som proforma eller uden aktier og reelle pengestrømme strafferetligt må anses som almindeligt bedrageri, der blot er kamufleret ved komplicerede transaktioner."

**F.**     **Conclusion**

47.    In conclusion, Danish law does not provide any basis for the argument that the defendants acquired any form of "ownership" of shares originating from share purchase contracts with purported "sellers" that *did not* deliver any actual shares.

48.    Based on the aforementioned legal sources it is my firm conclusion that a party cannot create any form of ownership under Danish law, including "beneficial ownership" under the US/Denmark Tax Convention, by entering into a contract to purchase shares from a purported "seller" that does not deliver any actual shares under that contract.

## IV.    SKAT's Fraud claims

**A.**     **SKAT's claims**

49.    SKAT's *fraud claims* in the present litigation rely on the allegations that the defendants (including the beneficial holders, their advisors and agents) misinformed SKAT about certain facts that were material for SKAT's refund payments. By doing so, they caused a financial loss to SKAT, and being the arm in charge with the payments of WHD refunds, effectively to the Kingdom of Denmark.

50.    Under Danish law the criterion of whether such actions (and the omissions associated with them) shall lead to a liability for that loss, is whether they qualify as *tortious* actions and omissions.

51.    The answer to that question is affirmative. Under general judge-made principles in Danish law, a party acting with *intent* to cause damage to another party, will be liable towards that other party for the full amount of the caused damage. This result follows from the so-called *culpa rule* which I will describe in the following.

52.     In the present Section, I will *first* focus on the liability for damaged caused by fraudulent (i.e. intended) actions. In Sections V, VI and VII I will *then* explain how that the *culpa rule* also applies in other instances where damage is caused by negligence or by aiding and abetting fraud and misrepresentation.

**B.     The culpa rule**

53.     As I have just said, the general rule for imposing non-contractual liability on a tortfeasor, unless otherwise provided, is the so-called *culpa rule*. The *culpa rule* has developed over generations of court practice.

54.     The *culpa rule* provides that a tortfeasor is liable for his (1) willful or negligent acts and (under certain circumstances), omissions to the extent these acts and omissions (2) actually caused losses to the victim, to the extent these losses were (3) foreseeable, and provided that (4) no particular exceptions or modifications apply.

55.     Condition (1) is usually referred to as *the subjective test* because it asks what the tortfeasor could or should have understood in regard to the damage that resulted from his actions. The subjective test is passed if the tortfeasor acted *willfully* (i.e. with intent – in Danish "ved forsæt") *or* if the tortfeasor acted in negligence (i.e. carelessly and against accepted standard of behaviour in the said situation – in Danish "ved uagtsomhed").

56.     Being the fall-back rule of tort law, a Danish court will apply the *culpa rule*, unless otherwise provided by statute or – in certain circumstances – by deviating judge-made law.[6]

---

[6] The culpa rule is judge-made. It originates from Roman law, and its existence has been presumed in numerous statutory provisions over time, including Article 3-19-2 of the 1683 Code of Denmark (attached as <u>Exhibit 10</u>) under which employers and other principals are vicariously liable for negligent (culpable) actions caused by their employees and agents. The existence of the culpa rule is also assumed in numerous other statutory acts and in a countless number of court decisions. These many legal sources may often use the Danish synonym for the latin "*culpa*" which is most often translated to the Danish word "uagtsomhed" (in English, negligence or fault).

**C.**     **Willful acts**

57.     The subjective test of the *culpa rule* is undoubtedly met if a party acts *willfully* or with *intent* to cause harm.

58.     A tortfeasor is said to act willfully if he intended the loss to be caused by his actions. Willful acts are thus the result of a goal-oriented state of mind which in Latin is labelled "*dolus*" and in Danish "*forsæt*".

59.     An example hereof would indeed be a case where a party by acting *fraudulently* causes a loss to another party.

60.     In Danish legal terminology *fraud* is an example of a willful act exercised by a party in the course of contemplating or completing a transaction: A fraudster willfully induces his counterparty to act on the basis of untruthful information. When the victim suffers damage as a consequence of this deceit, the fraudster will be liable for the full loss.

61.     If, for example, A causes B to make a monetary payment that B was not otherwise willing or committed to make, had A's fraudulent information not been presented, A will be liable for B's loss caused due to his fraud under the *culpa rule*. This is so because any action that willfully causes a loss is an example of "culpa" in the form of "dolus".

**V.     SKAT's Negligent misrepresentation claims**

**A.     Does SKAT need to prove contractual privity towards the defendants?**

62.     I have been invited to describe whether it is necessary for SKAT to prove that it had a relationship of *contractual privity* with defendants or something close to privity in order to establish a claim of negligence against them.

63.     Contrary to the test applicable in some common law systems (as illustrated in the landmark 1854 *Hadley v. Baxendale* decision, attached as <u>Exhibit 35</u>), the starting point of this

methodology is not what particular "duty of care" the tortfeasor owed specifically towards this or that possible victim of his action. Hence, in Danish law, the tortfeasor and the victim are not seen as parties to a kind of "social contract" (imposed by law and typically, case law) to which the victim of his action would also be considered to be party.

64.     For the same reason, Danish law does not require privity between the tortfeasor and the victim as a precondition for raising claims for pure economic losses. A notable example is the Supreme Court decision in U 2000.365 H, discussed below in Section VI(C).

## B.     The standard of negligence in Danish tort law

65.     As I have stated above in Section IV(B), the subjective test under the *culpa rule* both includes cases of *intent* (i.e. willful actions) and *negligence*.

66.     In this Section I shall now look into the sub-category of negligence in order to cast light of SKAT's claims for "negligent misrepresentation".

67.     In Danish law, whether a tortfeasor acted "negligently", is measured against *accepted standards of behavior* in the relevant setting. This standard is often referred to by the "*bonus paterfamilias*" concept known from Roman law. The question thus is how "a reasonable man" would act under the given circumstances.

68.     Under this test, parties are required to act as one would generally expect them to in order to avoid damage on others. Outside the scope of specific rules of strict liability (as e.g. provided by statutory legislation or particular judge-made law) the tortfeasor is only liable in tort if he did not live up to these requirements.

69.     In determining what standard of a *bonus pater* the tortfeasor should live up to, a Danish court will focus on what duty of care the legal system would expect from parties in general in a situation like the one that resulted in the loss.

18

70.    In certain cases, such as for distribution of liability among multiple tortfeasors, it may be relevant to distinguish between *willful* and *grossly negligent/reckless acts,* on the one hand, and acts of *simple negligence,* on the other hand. This distinction, however, is not relevant in this litigation, because tortfeasors are liable under the *culpa rule* both for their simple and gross negligence.

## VI.    SKAT's aiding and abetting fraud claims

71.    I will now address the question whether individual defendants who themselves did not make a fraudulent statement in refund applications submitted to SKAT can be liable under Danish law for fraud or aiding and abetting fraud or for negligent misrepresentation?

### A.    <u>The general rule in Danish law on liability for aiding and abetting</u>

72.    The culpa rule *not only* applies to tortfeasors whose actions or omissions have been the "root cause" of the occurred damage. It *also* applies to parties who have contributed – willfully or negligently – in various ways to the course of actions that resulted in the damage. Whereas the main tortfeasor is regarded as such because his action is perceived as the root cause in the line of events that resulted in the damage, the role of the aiding and abetting party is more limited, e.g. confined to specific actions, informational advice or certain forms of mental support.

73.    Therefore, both the tortfeasor and any subsequent aiding and abetting parties are jointly liable for the damage resulting from any act or omission that each of them is liable for under the *culpa rule* or any other rule of tort liability.[7]

---

[7] This principle follows from well-established Danish court practice. This practice mirrors the provision of Section 23 of the Danish Criminal Code (attached as <u>Exhibit 12</u>), according to which criminal liability applies to any person who "by incentive, counsel or action" assists in committing the crime. Both Danish tort and criminal law refers to such accessory liability as participation ("medvirken").

74. Hence, the fact that another person is subject to accessory liability down the line of events does not release the main tortfeasor from its liability. In cases where both the main acting party and the aiding and abetting party are liable in tort, both parties are jointly liable for the damage that has occurred as a result of their respective negligence.

**B.      Liability for the aiding and abetting of legal advisors etc.**

75. When applied to persons acting through an authorized agent or body, the *culpa rule* may both be applied to the principal and to its authorized agent. According to the principle set forth in Article 3-19-2 of the early 1683 Code of Denmark, a principal is liable (on an objective basis) for any culpable actions made by its servant or agent.

76. The *bonus pater* standard also applies to professional advisors. Therefore, accessory liability will often extend to legal advisors, accountants and banks that play a role in the planning and execution of transactions that may cause loss to third parties.

77. In determining the scope of the liability for aiding and abetting parties, one will typically ask whether the line of events that led to the damage would have occurred without the actions or omissions of the aiding and abetting party.

78. When acting in negligence, aiding and abetting tortfeasors are judged under the *bonus pater* standard that applies to the role of the tortfeasor in the line of events that caused the damage. In principle, this standard makes no distinction between tortfeasors who played a major or minor role in that line of events: As illustrated by the Thrane case (referred to below), each tortfeasor that contributed willfully or recklessly to the cause of events that caused the damage, will be held jointly liable for acts.

20

## C. **The Thrane case**

79.     A significant illustration of this interplay is provided by the landmark decision by the Danish Supreme Court in the so-called Thrane-case, published in U 2000.365 H (attached as Exhibit 11). The case is illustrative of a (criminal) practice of asset stripping ("selskabstømning") of net value companies ("overskuds-selskaber") that took place in the 1990's to the detriment of SKAT's claims for taxes in those companies.

80.     Claimant was the bankruptcy estate of a company (C) that brought an action against the owner of a so-called net value company, Ms. Else Thrane and to Ms. Thrane's lawyer (L), her accountant (A), and a bank (B). The background of the litigation was the following:

81.     Ms. Thrane had decided to liquidate her (fully owned) net value company C in a solvent liquidation. Her own involvement in the company was limited. It had been managed by her husband, but when he had passed away some years before, she had sold its activities so that the balance sheet now only showed one asset (a bank account), and one liability owed to SKAT. Ms. Thrane had a clear intention to pay that debt as part of the liquidation.

82.     After having made due public announcement for possible (other) creditors, Ms. Thrane was contacted by a third party, Mr. Paul Fischer, who offered to purchase the company through his company (the buyer). Mr. Fischer offered a price that exceeded the net value of the assets (i.e. the total of bank accounts minus the tax debts). His offer equaled 55 per cent of SKAT's claim.

83.     Having consulted with her advisors – lawyer L and accountant A – Ms. Thrane accepted Mr. Fischer's offer. She also accepted the set of instructions provided by Mr. Fischer on how to complete the transaction without providing any cash from the buying company to cover the agreed purchase price.

21

84.     According to these instructions, the purchase price was to be paid in cash with a bank transfer from the buyer's account with Bank B. The financing of this cash transfer was provided by Bank B against Ms. Thrane's promise to transfer, on the very same day, the company's cash deposit to Bank B. Having received that amount, Bank B would then forward the deposit to a bank account at the Danish Central Bank from which it was again forwarded to Ms. Thrane's bank account. When the shares of C were subsequently handed over to the buying company, an amount equal to the purchase price which Bank B had forwarded, was covered by a withdrawal of the bank deposit in the company.

85.     Sometime after this transaction, the company went bankrupt because its new owner (the buyer) failed to make sure that it would pay its tax debts. In the bankruptcy proceedings, SKAT – being the main creditor – brought actions against lawyer (L), accountant (A) and bank (B) for SKAT's loss due to the bankruptcy of company C.

86.     Both the Eastern High Court and the Supreme Court held that all four defendants were liable as aiding and abetting parties for their participation in the transaction that eventually led to SKAT's loss. The Supreme Court initiates its reasoning by concluding that the financing of the said transactions violated the self-financing prohibition provided in the Danish Company Act in force at that time.

87.     In regard to bank B, the Supreme Court noted that the bank knew that the financial transactions put at risk a company whose only asset was the net cash account, and whose only liability was SKAT's tax claim. By participating in the transactions, the bank "assisted in a negligent way to provide the illegal self-financing". On that ground, the Supreme Court confirmed the findings of the High Court that the bank had done nothing to prevent the

risk that SKAT was exposed to following this transaction. For those reasons, the bank was held liable for SKAT's losses.

88.     In regard to Ms. Thrane, the Supreme Court noted that she had only followed the advice of L and A. Since, however, Ms. Thrane had relied on this advice, the fault on her side should be considered the same way as that of her advisors. She was therefore liable in full for her participation in the transaction, because L and A ought to have known how the transaction would expose SKAT to a substantial risk of loss.

89.     Ms. Thrane, L and A were therefore held jointly liable for SKAT's loss. The Supreme Court noted that the two advisors had a particular reason to be aware of the risk that SKAT was exposed to, given the fact that the company was sold at a price that equaled 55 per cent of SKAT's claim.

90.     The Court moves on to say:

> "Else Thrane and her advisors should have seen that by selling the net value company there was a not unsubstantial risk that the latent tax burden would not be put forward or eliminated, and that the risk of a possible loss for SKAT would be particularly substantial if the purchase price for the company would be paid by its own assets. For Else Thrane and her advisors the agreed transfer of the sum to the National Bank of the purchase price and of the company assets at the same day would have made it likely that the present sale would effect a self-financing. However, Else Thrane and her advisors failed to take any substantial steps to reduce this risk to SKAT. For the said reason, the Supreme Court agrees [with the High Court] that Else Thrane, lawyer L and Accountant A by selling the surplus net value company in a reckless way has disregarded SKAT's interests and that they are therefore also liable for SKAT's loss."

91.     In subsequent decisions, the Supreme Court has confirmed the Thrane ruling. *See, e.g.* U 2001.634 H (attached as <u>Exhibit 14)</u> and U 2005.2397 H (attached as <u>Exhibit 15</u>) . The Court's main conclusion is that advisors and banks that provide advice in transactions that expose a third party to a substantial risk of loss, are obliged to take active steps to reduce that risk in order to avoid accessory liability for the loss to the third party.

**D.     <u>Conclusion</u>**

92.     Under Danish law, a person who aids at or abets a tortfeasor to act against his obligations according to the law and in a way that the person should have known would cause loss to a third party, may be liable for the loss caused by this action.

## VII.    Additional Issues Concerning Misrepresentation

**A.     <u>Misrepresentations about ownership or entitlement</u>**

93.     I have been asked to comment on the defendants' argument that their statements that they were beneficial owners of shares or that they were entitled to the benefits of the US/Denmark Convention, were statements about legal matters and that such statements cannot be the basis for a claim for fraudulent misrepresentation.

94.     In my opinion, there is no basis for any such argument under Danish law. This point corresponds to saying that a fraudulent statement is a legal issue if in theory it can be said to relate to something with a legal quality. For example, the fraudulent statement made by the car seller that "I own this car" (which is in fact stolen) should then not lead to a claim for fraudulent misrepresentation.

95.     No such defense or legal theory is recognized in Denmark. A person who represents falsely that "I own this car" with the intention to cause financial loss to its contractual

counterparty, can be prosecuted by criminal authorities and can also be held liable for a private

law claim for fraud by a victim of the fraud, even though there is a legal element to the assertion

of ownership over stolen property.

## B.   The standard of proof

96.   Defendants' Memorandum notes that under Utah law the standard of proof for a

claim of fraud is clear and convincing evidence. Danish law imposes on the claimant the burden

of proving its claims. The standard of proof is the greater weight of the evidence or the

preponderance of the evidence. Danish courts impose this burden on all civil claimants for all

civil claims. In civil law cases, Danish courts do not require a higher standard of proof for fraud

claims; it imposes the same standard for fraud claims as for any other claim, including

negligence.

## VIII.   SKAT's status as a legal entity in Danish law

## A.   Summary of conclusions

97.   Plaintiff in the present litigation is SKAT (the Customs and Tax Administration of

The Kingdom of Denmark).

98.   In *Andersen I*, Section III, I have explained that SKAT is an integral arm of The

Kingdom of Denmark, mandated with the administrative tasks related to the collection of taxes

in Denmark and related services.

99.   In *Andersen I*, paras. 23-38, I have explained how the various ministries within

the Kingdom of Denmark are not separate legal persons but indeed just branches of the Kingdom

of Denmark, and I have shown how this understanding is reflected in Section 14 of the Danish

constitution.

100.    In *Andersen I*, para. 39, I have substantiated this point by making reference to how the offset of claims between various government agencies within the Danish government administration are made.

101.    It is important to note that the responsibility for the conduct of government is not a *delegated* or *assigned* responsibility (e.g. by proxy, agency or power of attorney) but an original and primary responsibility. By its actions, the relevant ministry or governmental body will always bind the Kingdom of Denmark. This is so, regardless of whether such action relate to contracts, lawsuits or the public law competences in question.

## B.    Rebuttal of certain points in *Pilgaard II*

102.    *Pilgaard II* raises a number of points towards my observations and conclusions to which I strongly disagree. In the following I will address some of these points. As it will transpire, none of them gives rise to any modifications of my conclusions.

### 1.    The Kingdom of Denmark vs. the Church of Denmark

103.    In para. 56, *Pilgaard II* makes the point that pursuant to Article 14 in the Local Income Tax Act, SKAT also collects taxes to support the Church of Denmark and to the benefit of the Church of Denmark.

104.    This is correct, but does not alter the conclusion that SKAT is the correct party to initiate the present litigation. Section 66 of the Danish constitution provides that "The Established Church shall be laid down by statute." The statute referred to in this provision is today the Act Regulating the Economy of the State Church, which *Pilgaard II* refers to in para. 57. Without going into detail it is important to note that this Church (and its local churches) are separate legal persons with their own financial resources. For that reason, church taxes are not owned by the Kingdom of Denmark but by the Church of Denmark.

26

105.    It is important to note that the WHT tax which is the subject of the present litigation *does not* comprise church taxes. It is a pure *state* tax. None of WHT tax withheld on dividends from shares will therefore be transferred to the Church of Denmark. For that reason, the references hereto in *Pilgaard II* only proves the point that SKAT is empowered to raise its claims here, being the arm of the Kingdom of Denmark mandated to do so.

### 2.    The prerogative pursuant to Section 14 of the Danish constitution is indeed absolute

106.    In *Andersen I*, para. 38, I have stated that the power rested with the Prime Minister by Section 14 of the Danish constitution gives the Prime Minister the mandate to change the wording of statutory legislation to the effect that public authorities may be "renamed" to fit into the distribution of government responsibilities that the Prime Minister may decide. I have made this point in support of my conclusion that a ministry is not a separate legal person, but an integral part of the Kingdom of Denmark which is indeed a legal person.

107.    In para 72, *Pilgaard II* concludes that Section 14 of the Danish Constitution is not an absolute prerogative that empowers the prime minister to change competence rules in legislation. He thus refuses my interpretation in *Andersen I*, para. 25.

108.    This refusal is in no way substantiated.

109.    The *historic background* of the provision (as explained in *Pilgaard II*, para. 66) is of no relevance in itself.

110.    The same goes for the quotation from the textbook written by professor and former Supreme Court Justice *Henrik Zahle* (quoted in *Pilgaard II*, para. 72) according to which it is "difficult so see any constitutional argument" for a government decision that goes against "the clearly expressed prerequisites of the Parliament for allocation of powers". Professor Zahle might have been right in this observation, at least seen as a statement of legal politics. But he

does not claim that Article 14 should be understood accordingly. Furthermore, it is a fact that many ministries and other public entities are renamed and their mandates changed from time to time without changes in statutory legislation.

111.     As the most recent example hereof, I refer to government notice no. 794 of 8 August 2019 which makes reference to royal resolution ("Kongelig resolution") of 27 June 2019 on the distribution of tasks between the ministries. The resolution was made when the sitting Prime Minister (Ms. Mette Frederiksen) took office in June 2019, shortly after the election earlier that month. As one among several changes in the distribution of powers that follows from the resolution, Section 13 orders that the responsibility for collective bargaining, salaries, pensions, management and personnel is transferred from the Ministry of Finance to the Ministry of Taxation.

112.     *Pilgaard II* understands my analysis of Section 14 with its reference to the competence of "the King" as a "very literal" (para. 65) interpretation that does not take into account "changed constitutional reality" (paras. 68 and 78). If I understand him correctly, a more dynamic interpretation of Article 14 should apply.

113.     I disagree. My statement that for all practical purposes, references in the Danish constitution to "the King" refers to the minister in question (and ultimately the Prime Minister) not only follows from a literal interpretation of the provision. It is also a consequence of the constitutional fact that "the King" can never act on his own behalf.

114.     The fact that "the King" cannot act on his own behalf follows from the third sentence of Article 14 according to which "The signature of the King to resolutions relating to legislation and government *shall make such resolutions valid*, provided that the signature of the

King is *accompanied by the signature or signatures of one or more ministers*." (Emphasis added).

115.    It is thus clear by the wording of the constitution that "the King" (being presently understood as the sitting Queen Margrethe the Second) can never take any binding decisions on his own without the approval of a minister. For that very reason, the decision is in effect *taken* by that minister.

116.    Therefore, again, I must maintain my conclusion that each ministry and each administrative branch or agency acts under the responsibility and supervision of a minister who is in turn appointed by the prime minister to exercise the legal, factual and political functions of the Kingdom of Denmark.

### 3.    Danish ministries as plaintiffs in litigation

117.    In para. 81 *Pilgaard II* states that I have failed to discuss "the circumstance in which the Danish government or any of its ministries is a plaintiff."

118.    SKAT may just as the Ministry of Taxation and any other ministry indeed be a plaintiff in a litigations regarding civil law claims. One example is the Supreme Court decision in *U 1981.473 H* (attached as <u>Exhibit 16</u>) where SKAT (at that time named "Statsskattedirektoratet") raised a claim for damages against the CEO of a bankrupted company who had failed to withhold WHT in the company's salaries to its employees. There are no substantial differences between the private law claim that SKAT raised in the 1981 decision, and the claims that SKAT has raised in the present litigation.

119.    Just to make that clear, there are also numerous cases in which *the Ministry of Finance* appears as a party in a civil law claim. This happens every year in cases regarding government officials ("tjenestemænd").

29

120.    The Ministry of Finance may also appear as a party to other kinds of litigation regarding private claims where the Kingdom of Denmark is involved as a contractual party.

121.    One such example is the Supreme Court decision in U 1939.296 H (attached as Exhibit 17). In this case, the Supreme Court interpreted the provisions in the bond for a Danish government loan that gave creditors the option to receive payment in gold or gold equivalent. The case was litigated for the Kingdom of Denmark (being the *named debtor* in the bond) by the Ministry of Finance.

### 4.    Locus standi

122.    *Pilgaard II*, Section III(A)(1) states that in order to bring a case before the courts, the plaintiff must have *locus standi.* I agree to that. *Pilgaard II*, para 80, then makes reference to the case decided in U 2009.58 Ø (No. 18-md-2865, ECF No. 801-30, attached as Exhibit 18) which he claims to be an example of how a Danish ministry failed to prove such standing. I disagree to this interpretation.

123.    In the said case the Ministry of Employment had raised a claim against the Labour Market Appeals Board. The case was dismissed, but not – as *Pilgaard II* states – due to "lack of standing". The Eastern High Court did *not* decide whether the Ministry of Employment had "standing" in the case (being a part of the Danish government and such an arm of the Kingdom of Denmark that was clearly so, and the Ministry in fact participated in the case throughout the proceedings). Quite contrary. The court admitted the case with the ministry as a party. What the court said, after having heard the case, was that the ministry lacked *legal interest* in raising the claim. That is something completely different from standing.

124.    To understand the background of this outcome, it is necessary to understand the merits of the case. It concerned an administrative practice regarding a particular type of payment

from private unemployment funds. This practice had been brought before the Labour Market Appeals Board where it had been overturned on grounds that the Board interpreted certain provisions differently than the Ministry had. Even though, as a result of this overturning, huge amounts of money should now be paid from those private funds, and even though the Ministry for political reasons had decided to reimburse the unemployment funds for their costs due to this interpretation, the Ministry of Employment did not have any financial interest herein (and thereby no "legal interest" in the litigation) since the Ministry had not acted under a legal obligation to refund any part of these amounts to the funds.[8]

### 5.    The legal personality of Denmark

125.    It follows from *Andersen I,* section III(A), that SKAT is not a legal entity in its own right, separate from the Kingdom of Denmark. For this reason, the Kingdom's various ministries may bring claims in Danish courts, but a debtor who is sued by one ministry may counterclaim against that ministry for any amount owed by any other ministry. I have also made this point above in *Andersen I*, para 39.

126.    It follows from *Andersen I*, Section III(B), that Danish ministries appear before Danish courts in their own names when litigating private law claims such as SKAT's claims for compensation or restitution in the present litigation.

127.    *Pilgaard II*, para. 83, understands my conclusions in *Andersen I* to mean that I should have confirmed "… that administrative agencies (or ministries) may be sued, which only corroborates the conclusion that they are independent legal entities."

---

[8] In Danish the reasoning of the court reads: "Selvom afgørelsen måtte indebære, at der skal ske udbetaling af ydelser i størrelsesordenen 400-600 mio. kr. til efterlønsmodtagere, finder landsretten ikke, at Beskæftigelses-ministeriet har en økonomisk interesse i den trufne afgørelse, der kan begrunde søgsmålskompetence. Landsretten lægger herved vægt på, at ministeriet ikke har været retligt forpligtet til at friholde a-kasserne for det tab, de eventuelt måtte lide som følge af Ankenævnets afgørelse, men har valgt at tilbyde at friholde a-kasserne ud fra mere kulancemæssige overvejelser.

128.    This understanding is not correct. What I intended to say was that the ability of ministries to bring or defend litigation does not change the fact that there is only one legal entity. This is demonstrated by the fact, noted above in para. 100, that a claim by a ministry may be subject to a counterclaim or offset in the amount of a defendant's unrelated claim against any other ministry or agency.

## C.    The ability of Danish Courts to entertain the reverse situation

129.    I have been asked whether in a reverse situation, the United States would be allowed to appear as plaintiff in a Danish court with claims identical to SKAT's claims in the present litigation.

130.    My answer to that question is yes. A Danish court faced with such a claim would *not* preclude the United States from appearing as a plaintiff in such an action, assuming, again, that its claims were private law claims. This also means that the United States would indeed be entitled to litigate the types of claims that SKAT is pursuing in the present litigation before a Danish court.

131.    In other words: Like any other foreign state recognized by the Kingdom of Denmark, the United States may indeed appear as a party in a Danish civil law litigation and pursue the kinds of property or tort claims that any individual or other person can pursue in the Danish courts.

132.    In conclusion I find it clear and beyond reasonable doubt that the United States in a reverse situation could have filed similar claims of a private law nature, e.g. for recovery of losses or other types of compensation against Danish pension plans, in Danish courts, based on the type of fraud alleged here.

D.     **Conclusion**

133.     SKAT is not a separate legal entity from the Kingdom. SKAT is a ministerial arm within the Danish government and an integral part of the legal entity that is the Kingdom of Denmark. Therefore, under Danish rules SKAT is empowered and competent to bring private law claims that arise from payments SKAT made to claimants resulting from false dividend withholding tax reclaim applications.

## IX.     Statutory limitations of monetary claims in Danish law

A.     **The questions before me**

134.     In *Andersen II* I have presented the main rules of the Danish Limitation Act ("Forældelsesloven"), no. 552 of 6 June 2007, published as Consolidated Act No. 1238 of 9 November 2015 as amended in 2018, referred to as "**DLA**", with a particular focus on the *start* of the limitation period and its *suspension*.

135.     For an overall introduction to the main rules of the DLA, I make specific reference to Section IV(b) in *Andersen II*. I also refer to its Section IV(c) in which I give an overview of the Danish rules on suspension of the 3 year limitation period in cases where the claimant was unaware of the claim, including the role of the defendant.

136.     I stand with all my conclusions in this Declaration. Therefore, and since *Andersen II* has been produced in support of Defendants' Motion, I do not find it necessary to reproduce those conclusions here.

137.     Instead I will try to comment on a number of issues that SKAT's counsel has presented to me, namely:

> a.   When do the claims accrue and trigger the start of the limitations period under the DLA? I discuss this question below in Section IX(B).
> b.   When can SKAT be considered to have had sufficient knowledge to file a claim? I discuss this question below in Section IX(C).

     c.   Further specific questions will be discussed in Section IX(D).

138.    In addition hereto, SKAT's counsel has invited me to comment on the Declaration of Foreign Law dated 22 November 2021, Professor Anders Ørgaard. I will do so when relevant in the said structure.

**B.**    **The start of the limitation period**

    **1.**    **The general rule of DLA Section 2(1)**

139.    As indicated in *Andersen II*, para. 21, DLA *Section 2 (1)* provides that the limitation periods under the act shall be calculated from the *earliest* point in time where the claimant could *claim satisfaction* of its claim, unless otherwise provided by other provisions. (DLA *Section 2*, attached as Exhibit 19)

140.    As said in *Andersen II*, para. 26, similar rules as those just described also applied under earlier legislation ("the 1908 Act"). This means that court practice from the period before 1 January 2008 when the DLA came into force, is also of importance for understanding these provisions.

141.    The application of DLA Section 2 (1) necessitates an analysis of the specific line of events leading to the (alleged) unlawful payment from SKAT to each of the defendants in the litigation.

142.    In relation to each of SKAT's claims in this litigation the starting point of the limitation period should set in accordance with the following principles:

    **2.**    **SKAT's Tort claims**

143.    In regard to SKAT's *Tort Claims*, e.g. for misrepresentation or fraud (*see* above in Sections IV and V), DLA *Section 2 (4)* applies. According to this provision, the limitation period

34

for such "claims for compensation for non-contractual damages" is calculated from the *time of the occurrence* of the damage that gives rise to the tort claim.[9]

144.    This means that SKAT's claims *arise* on the date when SKAT suffered the loss. For all practical purposes, that will also be the date where a payment was made.

145.    The fact that the tortious actions or omissions might have been prepared or committed *prior* to the date of payment does not modify this conclusion, since these actions or omissions did not *cause* the damage *at* these earlier points in time. SKAT allegedly suffered the damage when the unlawful payment was made – not before, not later.

### 3.    SKAT's Restitutional Claims

146.    SKAT's *Restitutional Claims* came into existence on the date that a specific "WHT payment" was made. This is so, regardless of whether the WHT refund payment was made to a specific *party*, or to an *agent* acting on behalf of that party.

### 4.    SKAT's Unjust Enrichment Claims

147.    SKAT's *Unjust Enrichment Claims* came into existence on the date when the alleged unlawful enrichment took place.

148.    This date will also be the date where an amount *originating* from a WHT repayment was *credited* to an account held by the enriched debtor. In cases where an amount has been transferred from one account to another, this point in time may be different from the point in time where SKAT made the payment.

---

[9] The provision reads as follows in Danish: "For fordringer på erstatning eller godtgørelse for skade forvoldt uden for kontraktforhold regnes forældelsesfristen fra tidspunktet for skadens indtræden."

### 5.     Conclusion

149.     In conclusion, for all three types of claims, the earliest time for calculating the limitation period is the *date of payment*.

## C.     Did SKAT have sufficient knowledge of its claims prior to Summer 2015?

### 1.     DLA Section 3(2)

150.     As indicated in *Andersen II*, Section IV(c), DLA *Section 3 (2)* provides that the 3 year limitation period set forth in *Section 3 (1)* shall be calculated from the day when the claimant *became aware* or *should have become aware* of its claim. The test for whether the claimant "should have" become aware of its claim against a defendant is whether the claimant had sufficient information for a prudent person acting in the claimant's shoes to assess the basis for its claim against the defendant. (DLA *Section 3*, attached as <u>Exhibit 20</u>)

### 2.     SKAT's obligation to investigate

151.     In *Andersen II*, para. 37, I have concluded that Danish courts have held that a claimant "should not have" known its claim for repayment, if it has relied on "fraudulent information". *Ørgaard I* seems to understand this statement to mean that in order to suspend the termination of a claim, its creditor must be able to *prove* fraud.

152.     That was not my intention. A requirement of that nature would imply a need for criminal (fraud related) investigations to take place, as part of any suspension analysis. This would not make sense.

153.     What my statement was intended to convey was that there is a need to distinguish between cases where the taxpayer has *withheld* information towards SKAT in one category, and in another category cases where the taxpayer has *disclosed* all relevant information to SKAT

who, in turn, has failed to establish its claim upon inspection. That distinction was my reason for – perhaps imprecisely – referring to the first category as "fraudulent".

154.    According to *Ørgaard I*, para. 15, the fact that SKAT was obliged under Danish case handling rules for public entities (referred to as the "inquisitorial procedure") to make certain investigations also means that SKAT *should have been aware* of its claims much earlier than it did. To support this allegation, *Ørgaard I*, para.18 and 19, makes reference to two statements of Professor *von Eyben*, and to a number of cases.

155.    Whereas I agree with the contents of Professor *von Eyben* (as discussed below in paras. 172 and 182), I fail to see that the case law produced justifies the existence of a general principle that public entities like SKAT shall make *active investigations* (like police investigations in criminal matters) on a presumption that facts of relevance to the case may be hidden somewhere, and that such principle is sufficient to trigger the statute of limitations against such a public entity.

156.    Quite contrary, the present case law – including the cases referred to by *Ørgaard I* – demonstrates that *only* in such cases where the relevant information was already available to the creditor (*in casu*, SKAT) is it reasonable to hold that SKAT had the sufficient knowledge due to its obligation to investigate (the "inquisitorial procedure").

157.    It does, in my opinion, make sense to draw a line between on one hand cases in which the taxpayer has *withheld* information (*see* below in Section IX(C)(3)) and on the other hand cases where the taxpayer has provided *full disclosure* of all relevant information to SKAT (*see* below in Section IX(C)(4)). In my opinion the outcome of the various cases is consistent with that dividing line.

### 3.  Cases regarding withheld information

158.    In most of the cases regarding withheld information, SKAT has inspected individual tax files, either on a routine basis, or because information on SKAT's claims came to its knowledge in other ways. These cases are thus characterized by the fact that the taxpayer *failed* to give SKAT the information sufficient to calculate its tax claim in the first place.

159.    An early example within this category is *U 1935.715 H* (attached as <u>Exhibit 21</u>), referred to in *Andersen II*, para. 39, and in *Ørgaard I*, para. 31. Regardless of whether one describes the facts of the case to the effect that the taxpayer acted fraudulently or not (which he may indeed have done, although this aspect is not in itself decisive for the outcome of the case), he had in fact *failed* to report a substantial amount that he had received as an income in 1925. The Danish Supreme Court held that *prescription* of the claim for taxation of this amount was therefore *suspended* until this information became known to the tax authorities in 1932.

160.    A *second* case stating the same principle is U 1936.823 Ø (attached as <u>Exhibit 22</u>). In this case a taxpayer had reported to SKAT that he was not obliged to pay *wealth tax* during the years from 1926 to 1933 (where he passed away) due to the fact that in 1925 he had founded a *trust* that had taken ownership of a substantial part of his assets. Since, however, the board of that trust did not fulfill the basic requirements that the taxpayer (as its founder) was not to receive any proceeds from the trust, SKAT claimed payment for wealth tax during the said period.

161.    The court held that none of these tax amounts were prescribed, because the said dispositions were not *known* to SKAT until later. The case is noteworthy because it accepts suspension of the prescription period even though SKAT by conducting a review at an earlier point in time would clearly have been informed of its claim.

162.    A *third* case that came out with the same result is U 1959.380/2 Ø (attached as Exhibit 23). This case involved the obligation to pay *weight tax* on a truck trailer for the years from 1938 to 1942. Shortly after having been registered in the motor vehicle register, the owner reconstructed the trailer so that a truck load was mounted. Due to this reconstruction the owner only paid a lower duty of the trailer than he should have. Whereas criminal liability for the owner was time-barred, his liability to repay the duties owed was not. SKAT's claim for weight tax for the full period was thus suspended until a criminal investigation in July 1956 made the said evasion known to SKAT.

163.    A *fourth* example is *U 1994.168 H* (attached as Exhibit 24). In para. 34, *Ørgaard I* makes reference to that case, however with no further comments because "it is not apparent that the Supreme Court thought that the taxpayer committed an offense." I agree that this is not apparent, but I fail to see that this offence (or non-offence) is material to the outcome. The main facts of the case were the following:

164.    During the period from 1972 to 1984, a Danish limited company had deducted yearly amounts in its income tax as so-called "discounts" (in Danish: "rabat"), "goods discounts" (in Danish: "varerabat") and "royalty" (in Danish: "provision"). The company had paid the amounts to a Swiss company which, according to SKAT, was under the control and influence of the main shareholder of the Danish company. During a tax review that took place in 1983, SKAT (acting through a local municipality) was informed of the deduction. This information led SKAT to decide that the said amounts were not deductible expenses in the Danish company, but (in substance) a dividend paid to its shareholder. The Supreme Court held that the tax amount could be raised for the full period, without any suspension, because "there were no basis [to assume] that SKAT should have taken steps for a revision prior to 1983."

165.     A *fifth* example is reported in TfS 2001 171 Ø (attached as <u>Exhibit 25</u>), referred to in *Andersen II*, para. 39. Here, a Danish company had obtained *custom free* status in relation to certain goods imported from Bangladesh. After expiry of the limitation period, SKAT discovered that the certificates of origin were false and that the goods were most likely imported from China, from which such custom free status did not apply. The court held that SKAT should *not* have known of its claim for repayment of customs. Therefore, due to suspension, SKAT's tax claim was not time-barred.

166.     I would also like to articulate my reference in *Andersen II*, para. 39, to the high court decision reported in TfS 1988 641 V (attached as <u>Exhibit 26</u>) because its factual circumstances share many points of similarity with the WHT case complex. *Ørgaard I* does not provide any other comments to that decision apart from an observation that it did not refer to information being fraudulent (an observation that I agree to, but do not find relevant). The main facts of the case was as follows:

167.     In October 1979 SKAT changed its practice on taxation of interest income and expenses for loan-financed government bonds. During meetings between a tax-payer and SKAT in November 1979, the tax-payer gave SKAT several pieces of untruthful information regarding his ownership of a number of such government bonds that he had purchased by taking a loan with a stock broker. Had this information been accurate, SKAT could have raised its claim for taxes at that time. The court held that nothing in the information provided by the taxpayer at that time could have given SKAT reason to doubt the correctness of the information.

168.     In 1980, SKAT initiated investigations with various stock brokers regarding those practices of loan-financed bond purchases. It was not until the start of 1983 that SKAT visited the stock broker involved in the said transaction. At first, the stock broker refused to hand out the

40

relevant documentation which was not provided until 22 November 1984. Therefore, the limitation period for SKAT's 1978 tax claim started at that date.

169.     The reported in *U 2006.1492 H* (attached as Exhibit 27) concerned the income taxation of two holding companies that were held by a married couple. The wife had sold a company to the holding companies for an amount of 100 GBP, which was the price she had paid for it a few months before. During those few months, however, its assets had now grown to an amount of circa 10 million DKK due to certain financial transactions orchestrated by the married couple. After having been informed of these transactions by police authorities, SKAT put forward a claim for income tax in the two holding companies based on their real values (and not the 100 GBP that the company had been sold for). Since SKAT should not have known of the transactions that had led to these real values, its tax claim was not time-barred.

170.     Finally, a specific comment is needed to understand the case reported in *U 1981.72 H* (attached as Exhibit 28), discussed shortly in *Ørgaard I,* para. 21. The case concerned a taxpayer who conducted two businesses, both as a farmer and as a real estate agent. Under the rules of that time, the turnover of the farming business *was* subject to VAT, but the real estate turnover *was not*.

171.     During a control inspection in March 1978, it came to SKAT's knowledge that the taxpayer had deducted an expense in his real estate agent business that rightfully should have been deducted in the income of the farming business. The unpaid VAT amount should thus have been paid on 1 July 1973. The Supreme Court held that prescription of this claim was *not* suspended when SKAT made its inspection in 1978.  Therefore, the VAT claim was time barred (under the 5 year limitation period applicable then) for the period from 1 august 1972 to 31 January 1973.

41

172.     Professor *von Eyben* has explained that the decision is justified on the presumption that the local VAT authorities (as it also transpired from the case) was obliged to make inspections of such VAT filings at least once within any five year period, and that such an inspection would have disclosed the facts.

### 4.     Cases with full disclosure

173.     As stated above I find it relevant to categorize cases where the taxpayer provided full disclosure to SKAT (as obliged to under applicable rules) in one category. In my opinion this case law confirms the principle that no suspension will take place if the taxpayer provided all relevant and truthful information to the tax authority, even though SKAT could not establish its claim unless it looked into these details.

174.     All of the cases referred to by *Ørgaard I*, paras. 21 to 26 clearly fall in the category of full disclosure:

175.     In U 1936.677 H (attached as <u>Exhibit 29</u>), the taxpayer had provided SKAT with all relevant information, although this information resulted in an unjustified low tax payment. SKAT's claim was therefore prescribed and there was no room for suspension.

176.     In U 1963.377 H (attached as <u>Exhibit 30</u>), SKAT's tax claim originated in the taxpayer's incorrect deduction of premium expenses for a life insurance. The claim was prescribed because SKAT was in possession of the information necessary to raise the tax claim.

177.     The same goes for TfS 1988 581 V (attached as <u>Exhibit 36</u>, referred to in *Ørgaard I*, para. 22). Here the taxpayer had rendered truthful information in its tax reports. Although SKAT, upon subsequent inspection, concluded that this information should lead to higher tax payment, the tax claim was subject to limitation under the 1908 Act because no suspension took place.

178.    I will end my examination of Danish case law here, without making reference to practice regarding other types of claims than claims for duties and taxation. For the record, let me just confirm that similar principles apply for such claims.[10]

### 5.    Discussion

179.    When this case law is applied in regard to the present WHT litigation, it is essential to note that SKAT alleges that the WHT applicants *not only* submitted fraudulent information to SKAT in the form of information that referred to fictitious transactions and shares. They did so in such a *complicated* fashion that it has taken substantial resources, both for SKAT and for the police authorities that have been involved in the WHT case complex, to sort out the details that have now been produced as the basis for this litigation.

180.    Furthermore, it should be noted that the claims raised in the present litigation are not tax claims ("revenue claims") but claims under private law rules. SKAT is not a police unit mandated with the task to solve crimes and bring criminals to justice. To undertake such a task, it is first of all necessary to possess the right skills (which police professionals have).

---

[10]See for example the following decisions:

In U 2020.1961 Ø (attached as <u>Exhibit 31</u>), a pre-school teacher had received a lower salary from her employer (a municipality) than she was entitled to, due to a mistake. The mistake was made when she took the position in 2009 and her previous work experience was not given due credit as it should under applicable rules. The mistake became known 6 ½ years after the first salary payment. Although certain circumstances of the case (including the fact that the incorrect information was indicated in her first pay check in 2009 which showed a wrong "date of experience"), the court held that she had reasons to believe that the municipality would base salary payments on correct information on her work experience. For that reason, her salary claim was suspended from the first payment and her claim for repay of salary was not time barred.

The Supreme Court decision in U 1947.707 H (attached as <u>Exhibit 32</u>) involved the bookkeeper of a private association who had failed to account for some amounts that the association had received from 1934 to 1942. In a litigation where the association held the accountant personally liable for the said amounts, none of them were time barred, because the accountant had not provided the information that the association needed to bring the claim.

Likewise, in U 1997.1546/2 V (attached as <u>Exhibit 33</u>) the Nordic Copyright Bureau (NCB) – a collecting society mandated with the collection of license fees on sold records – could raise a claim for license fees that a record producer was due to pay for a longer period in time. Since the record producer had provided NCB with fraudulent information on the amounts due, NCB prescription of the amounts were suspended.

181.    Given this immense task and the related enormous costs, there is in my opinion no basis for assuming – as *Ørgaard I* seems to do – that SKAT due to the "inquisitorial procedure" applicable in Danish law should have possessed all relevant information more or less as the WHT refund payments were made.

182.    Furthermore, the presented case law does not assume that such an obligation *exists*. As discussed above in para. 172 in relation to Professor von Eyben's comments to U 1981.72 H, it may follow from internal case handling rules that SKAT should generally make control inspections within certain periods. Outside the scope of such rules, there is no basis to assume that such an obligation to make certain tax inspections within certain periods of time exists – with the far reaching consequences it might have on SKAT's possibility to prosecute its claims. In all circumstances, the presence of such a rule has no place in relation to claims that can only be ascertained after extremely complicated investigations like those necessitated in the present litigation.

183.    Quite contrary, the case law referred to above clearly shows that in cases where SKAT has been misinformed by the taxpayer to a much *lower degree* (characterized by the fact that SKAT *could* – by investigating the file – easily have discovered the "realities" of the case), the time bar of SKAT's claims will be suspended.

184.    Under the Danish statute of limitations, a critical question is, at *what point in time* SKAT should have known of this fraudulent information, with the consequence that SKAT at least at that time "should have" known its claim against a particular defendant.

185.    As I have stated in *Andersen II*, para. 46, it is important to note that the information of the ownership of stocks that gave basis for each application, the cash flow of the WHT amounts that were subject to SKAT's demand for repayment, and the beneficiaries of the

44

pension plans *were not* public information that SKAT had access to. Even if SKAT knew that some applications might be fraudulent (although I have not seen anything in Defendants' Motion or Danish law declarations to suggest that SKAT knew that any applications were fraudulent prior to Summer 2015), such suspicion would require specific examinations to reject or ascertain, and perhaps additional examination to determine the person or persons responsible for such fraud.

186.    I therefore stand behind my conclusion in *Andersen II*, para. 47, that the information shared with SKAT in June 2015 by the whistleblower only indicated that fraudulent activities took place with entities seeking refunds pursuant to the double taxation treaty with Malaysia. It did not *in itself* give SKAT a basis to pursue its claims against each of the defendant U.S. pension plan recipients and to claim damage from parties who participated in the fraud.

187.    To make such tort claims, SKAT would have to investigate the WHT applications that defendants participated in submitting to ascertain which ones were lawful or wrongful, and if wrongful, the identity and roles of each participant in the scheme. Since that task in itself would require substantial resources and planning, I cannot conclude that SKAT "should have" known either its claims or the relevant defendants to the claims in June 2015.

188.    Therefore, in relation to each defendant, there is a need to provide evidence of *when* SKAT became aware of – or should have been aware of – its possible claim for damage in regard to that *individual* case. Again, I am not able to establish that particular point in time since it will depend on the particular circumstances in relation to each claim.

189.    This also means that if SKAT had no such knowledge of any facts that might provide a basis for raising a claim against a specific defendant, the 3 year prescription period

does not start to run, until SKAT became aware or with reasonable diligence should have become aware of its claim against that defendant.

## D.    Specific questions

190.    I will finally attempt to answer some very specific question that SKAT has presented me with:

### 1.    For each claim, does the limitations period apply separately to each individual payment that SKAT made?

191.    The answer to this question is *yes*.

192.    As said above in Section IX(B)(1-2) above, the limitation period of repayment claims and tort claims starts on the particular dates where each specific unlawful "WHT payment" was made.

193.    In regard to Restitutional Claims, I refer to my conclusion above in Section IX(B)(3) from which it transpires that the date when the alleged unlawful enrichment took place is the starting point of the limitation period. In practical terms, this date will generally be the date where an amount *originating* from a WHT repayment is credited to an account held by the debtor of the Restitutional Claim.

194.    In cases where an amount has been transferred from one account to another, this point in time may be different from the point in time where SKAT made the payment.

### 2.    Should SKAT have known about all its claims before January 1, 2015, even if it did not discover that there was a fraud, and the identity of the defendants who were committing the fraud until long after January 1, 2015?

195.    The answer to this question is *no*.

196.    Even on the assumption that SKAT *should have* reacted upon Ms. Lisbeth Rømer's attempts to alert the senior SKAT management of problems she had identified with SKAT's process for issuing refunds of WHT (as it is alleged in Section IV of "Defendants' Rule 56.1 Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment"), Ms. Rømer has made clear that nobody at the time believed that SKAT had in fact received any fraudulent reclaim applications.  And even if Ms. Rømer or others suspected that SKAT might have received fraudulent reclaim applications over the years, such reaction would in itself not have made it possible for SKAT to identify what parts of the numerous WHT payments over the years that were legitimate and illegitimate. In order to identify each of these claims, SKAT would have to make a specific investigation of each individual claim.

197.    Similarly, even if SKAT knew that in 2014 it had paid out more money in reclaims than it had obtained in withholding tax for dividends issued by one Danish company, and even if SKAT should have suspected that such overpayments were due to fraud rather than to the timing of when applicants submitted their reclaim applications or administrative errors, such reaction would in itself not have made it possible for SKAT to identify what specific refund applications related to that one issuer were legitimate and which were not legitimate. In order to identify each of these claims, SKAT would have to make a specific investigation of each individual claim and obtain the information needed to file the claim against the defendant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 6, 2022

Mads Bryde Andersen