# Exhibit 44

**CERTIFIED TRANSLATION**

## 5. The High Court's reasoning and ruling

The subject-matter of this case is a claim for damages from the Danish Customs and Tax Administration against Bech-Bruun I/S in consequence of the advice provided by Attorney A to North Channel Bank in 2014 concerning possible liability for the bank by assisting in a contemplated tax set-up involving refunds of Danish dividend tax. Attorney A communicated about this with lawyers from the German branch of the law firm Jones Day.

Back then, SKAT refunded withheld Danish dividend tax after an application accompanied by documentation of distribution of dividend with withheld Danish dividend tax and documentation of the recipient of dividend being subject to a double taxation treaty according to which the dividend was not taxable in Denmark. A refund was conditional on the issue of a dividend credit advice.

Already after the first email of 3 February 2014 from Attorney B and A's reply to that email of the same date and the assignment, it is clear that A's assignment was to assess North Channel Bank's possible criminal liability or liability in damages by issuing a dividend credit advice, including that two dividend credit advices would be issued in the set-up for the same dividend whereby there would be a risk that refunds of dividend tax would be applied for and paid twice. North Channel Bank's possible liability would be most obvious if the recipient of the dividend credit advice that North Channel Bank would issue would not be the right recipient of the dividend in terms of tax.

Already from the outset of the assignment A thus had a special reason to be careful when providing his advice. The advice, which must be deemed to be advice on a model, must therefore be assessed according to an aggravating fault standard. SKAT (subsequently the Danish Customs and Tax Administration) would be able to claim such fault liability as an aggrieved party even though the advice was provided to the client, but there is no other special obligation to safeguard SKAT's interests.

A signed and issued a Danish opinion on 4 August 2014 by way of a legal opinion on North Channel Bank's situation in the tax set-up. Following the email correspondence on 5 May 2014 and the subsequent email of 23 June 2014 from C and A's invoicing the same day, regard must, however, be had to the contents of the advice having been determined already on 5 May 2014.

As for A's advice, there are two completely different principal questions. Firstly, whether

A acted negligently by concluding that North Channel Bank "should not be subject to liability under Danish civil law that entails a duty to compensate the Danish State for any loss as a consequence of the bank's role in the contemplated transaction" by carrying out the transactions described in the tax set-up. This entails a legal opinion on the transactions. Secondly, whether A acted negligently by not having realised what turned out to be the case that the stakeholders in the tax set-up would act in such a way that the tax set-up would be circular and that it was either proforma or solely consisted of paper transactions without any shares and actual cashflows. This entails an assessment of what must be assumed that would actually take place.

*The advice on the described transactions*

The assessment of A's liability for the advice cannot solely be made on the basis of the conclusion in his Danish opinion but must include the entire contents of the Danish opinion, including both the model described (the contemplated transactions) in section 3 and the explicit assumptions regarding the model in section 4 seen in light of the assignment and the information that A had received during the advisory cycle. Assumptions and reservations cannot therefore be disregarded.

A Danish tax opinion of 27 June 2012 was available as the basis for the advice early on in the cycle. The tax opinion had been prepared by Attorney D from Hannes Snellmann Advokatpartnerselskab which, *inter alia*, concluded concerning the model described in the tax opinion that a US pension fund should be entitled to claim a full refund of the withheld Danish dividend on the shares (ie the Danish dividend tax) under the double taxation treaty between Denmark and the US.

However, during the advisory cycle the model described by Attorney D was changed in several respects, partly on the initiative of the client and partly on the initiative of A. A also received additional information about the model compared to the information in Attorney D's tax opinion. There was thus no tax opinion on the model on which A provided advice and thus not an external tax law opinion of whether the recipient of the dividend credit advice that North Channel Bank would issue would not be the right recipient of the dividend in terms of tax. A knew this as he clearly expressed in section 5.2 of the opinion that this entailed an element of uncertainty in the conclusion.

According to section 2.1.1 of A's opinion, the tax treatment in Denmark was not assessed by any other parties than North Channel Bank in the contemplated transaction.

Moreover, sections 4.5-7 of the opinion contain different assumptions concerning the ownership of the shares. This ownership must according to their wording and the connection as well as A's statement before the High Court be deemed to concern the legal/civil law ownership of the shares and not the ownership under tax law.

The opinion does thus not contain any position on or assumption that the recipient of the dividend credit advice that North Channel Bank would issue would be the right recipient of the dividend in terms of tax. As stated above, North Channel Bank's possible liability would, however, be most obvious if the recipient of the dividend credit advice that North Channel Bank would issue would not be the right recipient of the dividend in terms of tax. The question to A was thus whether North Channel Bank would incur liability for issuing a dividend credit advice without any knowledge of or position on whether the recipient would be the right recipient of dividend in terms of tax.

Indeed, A also gave considerations to the importance of the risk of the recipient of dividend not being deemed to be the right recipient of the dividend in terms of tax. A thus stated before the High Court that the fiscal ownership was pivotal for this advice, that he found that D's tax opinion was correct and that he took the tax opinion into account. In the conclusion in sections 5.2.1-5.2.3 A also explicitly pointed out the three different circumstances preventing him from making a more definitive assessment of North Channel Bank's position. All these circumstances concerned the fiscal ownership.

It was described to A already early on in the email correspondence that North Channel Bank's role in the set-up would be limited to providing services as a custodian to the parties in the set-up. Accordingly, A incorporated explicit assumptions in sections 4.9 to 4.12 of the opinion to ensure that the bank was only a custodian and acted as such in compliance with both its own standard procedures and standard custodian procedures.

Against the above background, the High Court does not find that on the assumptions stated in the opinion that A acted negligently by not explicitly taking a position in the opinion on whether in terms of tax the recipient of the dividend would be the right recipient of the dividend, concluding that that would not be the case and as a consequence advising North Channel Bank against participating in the set-up.

During the hearing of the case by the High Court the Parties agreed that the seller's sale of the borrowed shares entailed a fiscal disposal of the shares which entails that in terms of tax the pension plan is deemed to be the beneficial owner of the shares unless the

pension plan disposed of the shares in such a way that the ownership under tax law passed on to a third party. The High Court finds that at any rate there is no such certainty that by lending the shares or by entering into the forward contracts as described in the set-up the pension plan is no longer to be deemed to be the owner of the shares in terms of tax that it may be deemed to be culpable to deem that the pension plan remains the owner under tax law.

The fact that another bank had previously issued a dividend credit advice for the dividend does not in itself entail that North Channel Bank is not entitled to issue a dividend credit advice for the same dividend if the recipient of this dividend credit advice is both the owner under civil law as assumed as well as the right owner in terms of tax.

It is also noted that it is hard to imagine that North Channel Bank would be liable if a third party that lends the shares to a seller in the set-up seeks a refund of the dividend tax even though such party would not be entitled to do so. The third party in question does not have any relation with North Channel Bank in the set-up, the bank has not issued any dividend credit advice to him and according to the assumption in section 4.13 the bank does not have any reason to assume or information or knowledge whether the third party would submit an application for a refund of the dividend tax on the shares. Indeed, such an application and refund would also be liable to punishment as fraud.

A's advice that, as stated, is a "should opinion" on transactions carried out in accordance with the specified model cannot therefore be deemed to be culpable.

*Paper transactions without shares and actual cash flows*

The question is then whether A should have realised what turned out to be the case that the stakeholders in the tax set-up would act in such a way that the tax set-up would be circular and that it was either proforma or solely consisted of paper transactions without any shares and actual cashflows.

The High Court notes that implementing the tax set-up as proforma or without any shares and actual cashflows must be deemed to be ordinary fraud under criminal law that is merely disguised by complicated transactions.

The High Court finds that according to A's statement regard cannot be had to A going

through and understanding the German diagram. On 14 April 2014 when he received the diagram A thus stated that unfortunately his German skills were insufficient for the required level, and he gave the client three options to solve this situation, including that the client should pay (a modest sum) for a translation of the diagram. But the client chose another option, ie that instead A should base his further advice on the earlier model with some changes and the more general English text description of the transactions prepared by C that A received the day after. The consequence was that in agreement with his client A was not to include the German diagram in his advice.

The High Court finds that it cannot be deemed to be culpable that A assumed in connection with the assumptions in sections 4.9 to 4.12 of the opinion about the bank's role solely as an ordinary custodian, the provisions in section 3 about the third parties' role, in section 3.4 about the pension plan's receipt of the dividend and the assumptions in sections 4.5-4.7 about shares and dividend that the stakeholders in the tax set-up would act in accordance with the model so that the set-up would not be circular and so that there were actual shares and cashflows.

The High Court does thus not find that A acted negligently by his advice by not having realised that the model would be used to defraud the Danish Treasury of dividend tax and as a consequence advising against using the model.

The High Court thus allows Bech-Bruun I/S's primary plea of dismissal of the claim.

The High Court also notes that in connection with the submissions specified above the Danish Customs and Tax Administration cannot be deemed to have made a new submission and thus exceeded the framework of the High Court's ruling of 28 February 2022.

*Costs*

The subject-matter is a claim for damages of approximately DKK 725 million plus interest, approximately DKK 1.25 billion.

The trial hearing of the case took 18 days in court. The preparation including a ruling on edition has been extensive. There is no information about the number of hours that have been spent on the case by lawyers.

According to case law, the costs in a case with such high values must be fixed based on an estimate following an assessment of what can be deemed to be reasonable, also considering the scope and nature of the case. The scope and the liability attached to conducting the case must also be considered.

Against this background the High Court fixes the costs to Bech-Bruun I/S to be DKK 6 million exclusive of VAT in payment of the legal assistance costs.

In addition, the Danish Customs and Tax Administration shall refund Bech-Bruun I/S's translation costs of DKK 189,953.70.

1

## 5. Landsrettens begrundelse og resultat

Sagen angår et erstatningskrav fra Skatteforvaltningen mod Bech-Bruun I/S i anledning af den rådgivning, som advokat A ydede North Channel Bank i 2014 vedrørende et muligt ansvar for banken ved at medvirke til et påtænkt skattearrangement med refusion af dansk udbytteskat. Advokat A kommunikerede herom med advokater fra advokatfirmaet Jones Days tyske afdeling.

På daværende tidspunkt refunderede SKAT indeholdt dansk udbytteskat efter ansøgning vedlagt dokumentation for udbetaling af udbytte med indeholdt dansk udbytteskat samt dokumentation for, at udbyttemodtageren var omfattet af en dobbeltbeskatningsoverenskomst, hvorefter udbyttet ikke var skattepligtigt i Danmark. Det var et helt centralt element for refusion, at der forelå en udbyttenota (Dividend Credit Advice).

Allerede efter den indledende mail af 3. februar 2014 fra advokat B og As svar herpå samme dato og opdraget er det klart, at As opgave var at vurdere North Channel Banks mulige straf- eller erstatningsansvar ved at udstede en Dividend Credit Advice, herunder ved at der i arrangementet ville blive udstedt to Dividend Credit Advices for samme udbytte, hvorved der ville være risiko for, at der ville blive søgt og udbetalt dobbelt refusion af udbytteskat. North Channel Banks mulige ansvar ville være mest nærliggende, hvis modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, ikke skattemæssigt ville være rette udbyttemodtager.

A havde således allerede fra opgavens start en særlig anledning til at udvise forsigtighed ved sin rådgivning. Rådgivningen, der må betegnes som modelrådgivning, må derfor bedømmes efter en skærpet culpanorm. SKAT (senere Skatteforvaltningen) vil som skadelidt kunne gøre et sådant culpaansvar gældende, selv om rådgivningen er ydet over for opdragsgiver, men der foreligger ikke herudover nogen særlig forpligtelse til at varetage SKAT's interesser.

A underskrev og afgav den 4. august 2014 en erklæring (Danish Opinion), i form af en legal opinion, om North Channel Banks forhold i skattearrangementet. Efter mailkorrespondancen den 5. maj 2014 og den efterfølgende mail af 23. juni 2014 fra C og As fakturering samme dag må det imidlertid lægges til grund, at indholdet af rådgivningen lå fast allerede den 5. maj 2014.

I forhold til As rådgivning foreligger to helt forskellige hovedspørgsmål. For det første, om A har handlet culpøst ved at konkludere, at North Channel Bank "ikke bør være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion" ved gennemførelsen af de transaktioner, der er beskrevet i skattearrangementet. Dette indebærer en juridisk bedømmelse af transaktionerne. For det andet, om A har handlet culpøst ved ikke at have indset det, som viste sig at blive tilfældet, at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme. Dette indebærer en bedømmelse af, hvad der måtte antages faktisk at ville ske.

*Rådgivningen om de beskrevne transaktioner*

Bedømmelsen af As ansvar for rådgivningen kan ikke foretages alene på grundlag af konklusionen i hans Danish Opinion, men må inddrage det samlede indhold i denne, herunder både den beskrevne model (de påtænkte transaktioner) i pkt. 3 og de udtrykkelige forudsætninger herfor i pkt. 4, set i lyset af opdraget og de informationer, A havde modtaget i rådgivningsforløbet. Der kan således ikke ses bort fra forudsætninger og forbehold.

Til grund for rådgivningen lå tidligt i forløbet en Danish Tax Opinion af 27. juni 2012, udarbejdet af advokat D fra Hannes Snellmann Advokatpartnerselskab, der vedrørende den deri beskrevne model blandt andet konkluderede, at en amerikansk pensionsfond bør være berettiget til at kræve fuld refusion af det danske indeholdte udbytte på aktierne (dvs. den danske udbytteskat) i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Under rådgivningsforløbet blev den af advokat D beskrevne model imidlertid ændret på forskellige punkter, dels på initiativ af opdragsgiver dels på initiativ af A. Hertil kom, at A fik yderligere oplysninger om modellen i forhold til de oplysninger, der fremgik af advokat Ds tax opinion. Der forelå således ikke en tax opinion vedrørende den model, A rådgav om, og dermed heller ikke en udefrakommende skatteretlig bedømmelse af, om modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, skattemæssigt ville være rette udbyttemodtager. A var bevidst herom, idet han i erklæringen i pkt. 5.2 udtrykkeligt gav udtryk for, at dette indebar et usikkerhedsmoment ved konklusionen.

3

Ifølge pkt. 2.1.1 i As erklæring vurderes ikke den skattemæssige behandling i Danmark af andre parter end North Channel Bank i den påtænkte transaktion. Videre indeholder erklæringen i pkt. 4.5-7 forskellige forudsætninger om ejerskab til aktierne. Dette ejerskab må efter deres ordlyd og sammenhængen samt As forklaring for landsretten anses for at angå det juridiske/civilretlige ejerskab til aktierne og ikke det skatteretlige ejerskab.

Erklæringen indeholder således ikke nogen stillingtagen til eller forudsætning om, at modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, skattemæssigt ville være rette udbyttemodtager. Som anført ovenfor ville North Channel Banks mulige ansvar imidlertid være mest nærliggende, hvis modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, ikke skattemæssigt ville være rette udbyttemodtager. Spørgsmålet for A var således, om North Channel Bank ville pådrage sig ansvar for at udstede en Dividend Credit Advice uden viden om eller stillingtagen til, om modtageren skattemæssigt ville være rette udbyttemodtager.

A foretog da også overvejelser om betydningen af risikoen for, at udbyttemodtageren ikke anses for skattemæssigt at ville være rette udbyttemodtager. A forklarede således for landsretten, at det skattemæssige ejerskab var centralt for hans rådgivning, at han vurderede, at Ds tax opinion var korrekt, og at han lagde denne til grund. A gjorde endvidere i konklusionen i pkt. 5.2.1 – 5.2.3 udtrykkeligt opmærksom på tre forskellige omstændigheder, som forhindrede ham i at nå en mere definitiv vurdering af North Channel Banks position. Disse omstændigheder omhandlede alle det skattemæssige ejerskab.

Det blev allerede tidligt i mailkorrespondancen beskrevet for A, at North Channel Banks rolle i arrangementet ville være begrænset til at levere tjenester som depotbank til parterne i arrangementet. A indsatte i overensstemmelse hermed udtrykkelige forudsætninger i erklæringens pkt. 4.9 til 4.12, der skulle sikre, at banken udelukkende var depotbank og agerede som sådan i overensstemmelse med både egne standardprocedurer og normale depotbankprocedurer.

Landsretten finder på den ovenfor anførte baggrund ikke, at A under de i erklæringen angivne forudsætninger har handlet culpøst ved ikke i erklæringen udtrykkeligt at forholde sig til, om modtageren af udbyttet skattemæssigt ville være rette udbyttemodtager, konkludere, at dette ikke ville være tilfældet, og som konsekvens heraf fraråde North Channel Bank at deltage i arrangementet.

Parterne har under landsrettens behandling af sagen har været enige om, at sælgerens salg af de lånte aktier indebærer en skattemæssig afståelse af disse, hvilket indebærer, at pensionsplanen skatteretligt anses for retmæssig ejer af aktierne, medmindre pensionsplanen har disponeret over aktierne på en sådan måde, at det skatteretlige ejerskab er overgået til tredjemand. Landsretten finder, at der i det mindste ikke er en sådan sikkerhed for, at pensionsplanen ved udlån af aktierne eller ved indgåelse af forwardaftalerne som beskrevet i arrangementet ikke længere skal anses for ejer af aktierne i skattemæssig henseende, at det kan anses for culpøst at anse det skatteretlige ejerskab for at forblive hos pensionsplanen.

Det forhold, at der af en anden bank tidligere er udstedt en Dividend Credit Advice for udbyttet, indebærer ikke i sig selv, at North Channel Bank ikke er berettiget til at udstede en Dividend Credit Advice for det samme udbytte, når modtageren af denne Dividend Credit Advice er såvel civilretligt ejer, således som forudsat, som rette skattemæssige ejer.

Det bemærkes endvidere, at der næppe kan tænkes noget ansvar for North Channel Bank, såfremt tredjemand, der i arrangementet udlåner aktierne til sælger, søger refusion af udbytteskat, selv om vedkommende ikke vil være berettiget hertil. Den pågældende tredjemand har i arrangementet ingen relation til North Channel Bank, banken har ikke udstedt nogen Dividend Credit Advice til ham, og banken har ifølge forudsætningen i pkt. 4.13 ingen grund til at antage eller oplysninger eller viden om, hvorvidt tredjemanden vil indgive ansøgning om refusion af udbytteskat på aktierne. En sådan ansøgning og refusion ville da også være strafbar som bedrageri.

As rådgivning, der som anført er en "should-opinion", om transaktioner udført i overensstemmelse med den angivne model kan således ikke anses for culpøs.

*Papirtransaktioner uden aktier og reelle pengestrømme.*

Spørgsmålet er herefter, om A burde have indset det, som viste sig at blive tilfældet – at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme.

Landsretten bemærker, at gennemførelse af skattearrangementet som proforma eller uden aktier og reelle pengestrømme strafferetligt må anses som almindeligt bedrageri, der blot er kamufleret ved komplicerede transaktioner.

Landsretten finder, at det efter As forklaring ikke kan lægges til grund, at A gennemgik og forstod det tyske diagram. A meddelte således den 14. april 2014, da han modtog diagrammet, at hans tyskkundskaber uheldigvis var utilstrækkelige til det krævede niveau, og han gav opdragsgiver tre muligheder for at løse denne situation, herunder at opdragsgiver skulle betale (en beskeden sum) for oversættelse heraf. Opdragsgiver valgte imidlertid en anden mulighed – nemlig den, at A i stedet skulle basere sin videre rådgivning på den tidligere model med nogle ændringer og den af C udarbejdede mere overordnede engelske tekstbeskrivelse af transaktionerne, som A fik tilsendt dagen efter. Det følger heraf, at A efter aftale med sin opdragsgiver ikke skulle inddrage det tyske diagram ved sin rådgivning.

Landsretten finder, at det ikke kan anses for culpøst, at A ved forudsætningerne i erklæringens pkt. 4.9 til 4.12 om bankens rolle udelukkende som almindelig depotbank, bestemmelserne i pkt. 3 om tredjemændenes rolle, i pkt. 3.4 om pensionsplanens modtagelse af udbyttet og forudsætningerne i pkt. 4.5-4.7 om aktier og udbytte gik ud fra, at interessenterne i skattearrangementet ville disponere i overensstemmelse med modellen, således at arrangementet ikke ville blive cirkulært, og således at der var tale om reelle aktier og pengestrømme.

Landsretten finder således ikke, at A har handlet culpøst ved sin rådgivning ved ikke at have indset, at modellen ville blive brugt til at bedrage den danske statskasse for udbytteskat, og som konsekvens heraf frarådet anvendelsen af modellen.

Landsretten tager derfor Bech-Bruun I/S' principale påstand om frifindelse til følge.

Landsretten bemærker i øvrigt, at Skatteforvaltningen ved de ovenfor angivne anbringender ikke kan anses for at have fremsat et nyt anbringende og således være gået uden for rammerne af landsrettens kendelse af 28. februar 2022.

*Sagsomkostninger*

Sagsgenstandens størrelse udgøres af et erstatningskrav på ca. 725 mio. kr. med tillæg af renter, i alt ca. 1,25 mia. kr.

Sagen har været hovedforhandlet i 18 retsdage. Der har været en omfattende forberedelse, herunder med kendelse om edition. Der foreligger ikke oplysninger om, hvor mange advokattimer der er anvendt på sagen.

6

Sagsomkostningerne i en sag om så store værdier må efter praksis fastsættes skønsmæssigt efter en vurdering af, hvad der kan anses for rimeligt, også under hensyn til sagens omfang og karakter. Der skal endvidere tages hensyn til både arbejdets omfang og det ansvar, der er forbundet med sagens førelse.

På denne baggrund fastsætter landsretten sagsomkostningerne til Bech-Bruun I/S til 6 mio. kr. ekskl. moms til dækning af udgifter til advokatbistand.

Herudover skal Skatteforvaltningen refundere Bech-Bruun I/S' udgifter til oversættelser med 189.953,70 kr.

I, the undersigned, Jeanette Riis, certify that the preceding text in the English language is to the best of my knowledge and belief a true and faithful translation of the reasoning and ruling of the Danish Eastern High Court of 28 April 2022 in case BS-26436/2020-OLR between the Danish Customs and Tax Administration and Bech-Bruun I/S in the Danish language.

Witness my hand and official seal.
Copenhagen, 29 April 2022



Jeanette Riis
MA in Translation and Interpretation (English)